CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 19 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

CARRIE SILER,                    )
for J.D.P.                       )          Civil Action No. 7:08cv00197
           **Plaintiff,**    )
                                 )
                                 )
v.                               )
                                 ) By:  **Hon. Michael F. Urbanski**
                                 )      **United States Magistrate Judge**
MICHAEL J. ASTRUE,               )
COMMISSIONER OF SOCIAL SECURITY, )
           **Defendant.**     )

## MEMORANDUM OPINION

Plaintiff Carrie Siler ("Siler"), the mother of the minor child, J.D.P., brought this action pursuant to 42 U.S.C. § 1383(c)(3), incorporating 42 U.S.C. § 405(g), for a review of the final decision of the Commissioner of Social Security denying the claim for child's supplemental security income (hereinafter "SSI") under Title XVI of the Social Security Act (hereinafter "the Act") and alternatively seeking a remand pursuant to 42 U.S.C. § 405(g) for consideration of new information obtained subsequent to the administrative hearing. Because the Commissioner's decision was supported by substantial evidence and was legally correct, and because there is no reasonable possibility that the decision of the administrative law judge (hereinafter "ALJ") might have been different had this new information been presented at the administrative hearing, plaintiff's request for remand is denied and the government's motion is granted.

### I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the

factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

A child under the age of eighteen is considered to be "disabled" for purposes of eligibility for a child's SSI if he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitation, and which has lasted or can be expected to last for a continuous period of at least twelve (12) months, or results in death. 42 U.S.C.

2

§ 1382c(a)(3)(C)(i).  In determining whether a child is eligible for child's SSI on the basis of disability, a three-step evaluation process is followed.  20 C.F.R. § 416.924.

First, it must be determined whether the child is engaging in substantial gainful activity.  20 C.F.R. § 416.924(b).  If the child is not, it must then be determined whether the child suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.924(c).  If the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's impairment meets, medically equals, or functionally equals an impairment listed in the Listing of Impairments at 20 C.F.R. pt. 404, subpt. P, app. 1 (hereinafter "Listing" or "listing").  20 C.F.R. § 416.924(d).

Functional equivalence is defined as an impairment of listing-level severity; for example, it must result in "marked"[1] limitations in two domains of functioning, or result in an "extreme" limitation[2] in one domain.  20 C.F.R. § 416.926a(a).  There are six domains of functioning

---

[1] A "marked" limitation is defined by regulation as follows:

We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.  The overall assessment of the claimant's ability to appropriately, effectively, and independently perform activities must be compared to the performance of other children of similar age who do not have impairments.

20 C.F.R. § 416.926a(e)(2)(i).

[2] An "extreme" limitation is defined by regulation as follows:

We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously

3

assessed in determining functional equivalence: (a) acquiring and using information; (b) attending and completing tasks; (c) interacting and relating with others; (d) moving about and manipulating objects; (e) ability to care for oneself; and (f) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Having reviewed the record and after briefing and oral argument, the case is now ripe for decision.

## II.

Carrie Siler applied for SSI benefits for her son J.D.P, on November 20, 2003. (Administrative Record [hereinafter "R."] 57-59). J.D.P. suffers from attention deficit hyperactivity disorder (hereinafter "ADHD"), asthma, speech problems, learning problems, hearing problems, and stomach problems resulting in chronic diarrhea. (R. 358-59).

Siler's initial application on J.D.P.'s behalf was denied; Siler then requested a hearing before an administrative law judge. (R. 31.) On January 18, 2006, the ALJ held an administrative hearing in Roanoke, Virginia. (R. 348.) The ALJ heard testimony from J.D.P.'s mother, Carrie Siler; a medical doctor, Dr. Ward Stevens; and a psychologist, Dr. Gary Bennett.

---

limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

4

(R. 349.) J.D.P. appeared at the hearing. (R. 350.) At the time of the hearing, J.D.P. was in second grade. (R. 356.) The record, at the time of the administrative hearing included two IQ tests. J.D.P. scored eighty-five (85) on a test dated June 2, 2003. (R. 63.) J.D.P. scored ninety-two (92) on the second in January, 2005. (R. 203.)

On February 24, 2006, the ALJ issued a decision denying benefits. (R. 14-17.) The ALJ applied the three-step sequential evaluation process outlined above. The ALJ first noted that given J.D.P.'s age, he had not engaged in gainful activity. (R. 16.) Second, he noted that J.D.P. had asthma, ADHD, speech problems, hearing problems, learning problems, and stomach problems which were "severe" as defined by the regulations. (R. 16.) However, in the third and final step, the ALJ determined that J.D.P.'s impairments did not meet or medically equal the criteria set forth for any listed impairment. (R. 16.) In making this determination, the ALJ accorded great weight to the testimony of medical experts. (R. 16.) He further determined that J.D.P. does not have an extreme limitation or two marked limitations in the six domain areas that functionally equal a listed criteria. (R. 16-19.)

Siler appealed. She submitted additional evidence to the Appeals Council in the form of medical records from Dr. Scott Luthman, a teacher questionnaire, medical records from Seneca Health Services, school records regarding one of J.D.P.'s Individualized Education Plans (hereinafter "IEPs" or "IEP" for singular), and a psychoeducational evaluation from Chameleon Health Care, Inc., which included a new IQ test (collectively, hereinafter "interim evidence"). (R. 319-324, 325-32, 335-38, 339-43, 344-47.) J.D.P. scored a sixty-two (62) on the new IQ test on September 19, 2006. (R. 345.)

5

The Appeals Council denied request for review on January 31, 2008. (R. 5-8.) The Appeals Council noted in form language that it considered the additional materials submitted by plaintiff. (R. 8.) The interim evidence was included in the administrative record. (See R. R. 319-324, 325-32, 335-38, 339-43, 344-47.)

## III.

J.D.P. was born July 10, 1997. (R. 60.) The first indication of stomach and digestive problems in the administrative record is from August, 2001, when J.D.P. was taken to the doctor with complaints of foul smelling stool and earaches. (R. 85, 86.) The doctor noted that J.D.P. appeared to be a "normally developing" four-year old. (R. 87.) J.D.P. was given a pediatric nutritional consultation for toddler diarrhea, and prescribed Culturelle. (R. 87.)

On May 16, 2002, J.D.P. returned to the doctor because of otitis media (inflammation of the ear). (R. 87.) J.D.P.'s mother reported that his problem with diarrhea continued. (R. 88.) The doctor recommended that J.D.P.'s sugar intake be limited. (R. 88.) J.D.P. was on Claritin, Amoxicillin, and Ceftin. (R. 87-89.) On July 2, 2002, the record reflects that J.D.P. missed a second doctor's appointment in a month. (R. 281.) On October 17, 2002, J.D.P. visited the doctor because of complaints that he was not doing well in school. (R. 245.) He was given Augmentin and Dexedrine, presumably for ADHD. (R. 245.) On November 7, 2002, J.D.P. visited the doctor again, and notes reflect that he was doing better in school. (R. 245.) He was on Rocephine. (R. 245.) J.D.P visited the doctor again on November 8, 2002, with another report that he was doing better in school. (R. 244.) He was given a repeat of Rocephine. (R. 244.) J.D.P. continued to complain of earaches. (R. 243.)

6

During January, 2003, Nicholas County Schools, West Virginia created an IEP for J.D.P. (R. 76-84.) The IEP did not state that J.D.P. was mentally impaired, but rather stated that J.D.P. needed "specially designed instruction". (R. 78.) The IEP further stated that J.D.P. should spend ninety-six percent of his time in a regular education environment and four percent in a special education environment. (R. 79.) J.D.P. moved back to Roanoke, Virginia that spring. (R. 91.) Roanoke City also created an IEP for J.D.P. (R. 91.) The IEP identified J.D.P. as having a speech and language disability, (R. 91), and prescribed twice weekly speech therapy for J.D.P. (R. 98.) The record also reflects that J.D.P. had additional doctor visits for earaches in 2003. (R. 241, 226-27.) At some point, J.D.P. also had tubes inserted in his ears to treat the earaches. (R. 266.)

During February, J.D.P. was noted to have ADHD, but was "doing well." (R. 241.) At J.D.P.'s April 10, 2003 well-child examination, he was noted to have asthma, ADHD, and loose stools. (R. 226-27.) J.D.P. was still experiencing problems with earaches. (R. 227.) J.D.P. was placed on Augmentin for earaches and Dexedrine for ADHD. (R. 227.)

On May 1, 2003, Roanoke City Schools recommended that J.D.P. repeat kindergarten. (R. 68.) J.D.P. was given the Stanford-Binet test to measure cognitive skill development in June, 2003. (R. 63.) The test placed J.D.P. "at the lower limits of the average range (I.Q. = 85)." (R. 63.) The school psychological report stated that J.D.P.'s overall verbal reasoning was within normal limits, at ninety-three (93), and that J.D.P. appeared to have a year developmental delay. (R. 63.) J.D.P.'s abstractive/visual reasoning was at the lower limits of the average range at eighty-nine (89). (R. 63.) His quantitative reasoning skills score was ninety-two (92), and his

7

short term memory score was eighty (80). (R. 62.) J.D.P.'s receptive language development was also within normal limits, at ninety-nine (99). (R. 62.) The report concluded:

> To summarize, the findings are reflective of a youngster who demonstrates generally low average cognitive ability, with his weakest skill area being that of short-term memory. JD's academic progress has been slow and impeded, to some degree, by the presence of ADHD symptoms for which medication has now been prescribed, and deficits in his spoken language (articulation in particular). JD currently receives speech and language services and it does appear that further services are warranted. It will be necessary, however, for the eligibility committee to meet and discuss all test findings in an effort to determine how to best meet his educational needs. The findings of this examiner do not appear to qualify him for Special Education services, although the committee may wish to consideration the development of a 504 plan to provide JD with modifications in the classroom that relate to decreasing his ADHD symptomology.

(R. 62.)

During a June 9, 2003 doctor's office visit, J.D.P. was noted to be "[m]uch improved per mother." (R. 222.) A doctor's report stated that J.D.P.'s academics, attentiveness, hyperactivity, impulsivity, school, and home behavior all showed improvement. (R. 221.) However, in September, 2003, J.D.P. was again reported to have trouble with ADHD at school. (R. 238-240.) In September or October, 2003, J.D.P.'s ADHD medication was changed to Adderall. (R. 237-38.) He was reported to be doing well and his mom was "thrilled w[ith his] school performance." (R. 238.) By December, 2003, J.D.P. had moved again and was "doing very well." (R. 237.)

On February 3, 2004, J.D.P. visited the doctor for a viral syndrome and asthma. (R. 236.) On February 10, 2004, a doctor's note reported that J.D.P.'s "[t]eachers & mom concerned meds not working. Still very distractable. Difficult to keep on task. Grades are starting to improve a little but needs help." (R. 235.) J.D.P.'s July 16, 2004 well-child examination noted that J.D.P.

8

had asthma, ADHD, and chronic diarrhea. (R. 312.) The doctor discussed limiting J.D.P.'s juice intake to help with the chronic diarrhea. (R. 312.) On August 26, 2004, J.D.P. missed a second appointment in a week at Pediatric Gastroenterology & Nutrition. (R. 283.)

In March, 2004, a consultant completed a childhood disability evaluation (hereinafter "March Evaluation"). (R. 246-51.) The evaluation noted that J.D.P. had ADHD, asthma, and a speech delay. (R. 246.) The consultant found the J.D.P. had a marked limitation in attending and completing tasks. (R. 248.) The consultant further found that J.D.P. did not have two marked limitations or one extreme limitation. (R. 246-51.)

On September 23, 2004, J.D.P. was suspended for one day for threatening another student. (R. 153.) On October 21, 2004, J.D.P. missed a third appointment in three months with the gastroenterologist. (R. 282.)

On November 1, 2004, the gastroenterologist saw J.D.P. and found that J.D.P. had toddlers' diarrhea. (R. 262.) The doctor noted that "[e]xcessive consumption of these [sucrose and or/fructose heavy drinks] will lead to diarrhea and increased stooling." (R. 262.) On December 7, 2004, J.D.P.'s mother brought him to the doctor complaining of malodorous stools. (R. 259.) The doctor proscribed Alinia. (R. 260.)

During the fall semester of the 2004 school year, J.D.P. was tested again. (R. 208.) J.D.P. scored in the fifth percentile for reading, and in the twenty-third for math and thirtieth for written language. J.D.P. scored in the seventy-ninth percentile for oral expression. (R. 208.) He was then seven years old and in first grade. (Def. Brief. 7.) The report noted that J.D.P.'s functions in his educational environment could have been influenced by a recent move from Roanoke to West Virginia and then back to Roanoke during that school year. (R. 208.) (J.D.P.

9

appears to have changed addresses seven times since kindergarten, including moves to and from West Virginia from Virginia. Def. Brief, Dkt. #25, at. 7.)

In November, 2004, a second childhood disability evaluation was completed by a consultant (hereinafter "November Evaluation"). (R. 228-33.) The evaluation stated that J.D.P. had a marked limitation in interacting and relating with others, specifically in speech. (R. 230.) However, the evaluation found that J.D.P. did not have two marked limitations or one extreme limitation. (R. 228-33.)

J.D.P. visited the doctor again in January, 2005. (R. 256-58.) The doctor's history noted that J.D.P.'s pain had resolved and that he had firmer, better smelling stools. (R. 256.) This was attributed to the change in diet and other intervention; the record reflects that J.D.P. was no longer taking Alinia. (R. 256-58.)

Roanoke City Schools assessed J.D.P.'s speech and language in January, 2005, when J.D.P. was seven and a half years old. (R. 204.) J.D.P. was given the Woodcock-Johnson III test. (R. 204.) His scores were eighty-eight (88) on verbal, ninety-eight (98) on performance, and ninety-two (92) full scale. (R. 203.) His teacher noted that he was struggling and relied on others for direction. (R. 203.) The evaluation notes that J.D.P.'s language services may have been interrupted during one of his moves from Roanoke, Virginia to West Virginia. (R. 204.) J.D.P. was found to have difficulty speaking and "verbally expressing himself." (R. 206.) The evaluation noted that J.D.P. passed a hearing screening (R. 205), but that his articulation and phonology was profoundly delayed and impacted his communication skills. (R. 206.) The report recommended direct therapy. (R. 130.)

10

At the end of the 2004-2005 school year, J.D.P. received B's and C's, except for a D in Language Arts. (R. 147.) Though he received a C in Reading, his teacher noted that he read below grade level. (R. 147.)

On February 4, 2005, J.D.P. underwent an upper endoscopy. (R. 297-301.) The final diagnosis included mild gastritis, and some inflammation and fragmentation of the mucosa. (R. 299.) During May of 2005, J.D.P. visited the doctor about warts and ringworm. (R. 286-92.) The doctor noted that the general impression of J.D.P. was that he was "well developed [and] well nourished." (R. 291). On July 6, 2005, J.D.P. failed to show up for an appointment with the gastroenterologist. (R. 284.)

Plaintiff was counseled by TANF regarding school absences in February, 2005. In December, 2005, Nicholas County Schools in West Virginia completed an IEP for J.D.P. (R. 209.) The IEP noted that J.D.P. continued to have problems with articulation and was easily distracted. (R. 212). The IEP placed J.D.P. in regular classes seventy-nine percent of the time, and special education twenty-one percent of the time. (R. 216.)

In 2006, J.D.P. saw Dr. Scott Luthman regarding chronic diarrhea. (R. 319.) In April, 2006, Ms. Tammy Hunter, J.D.P.'s grammar, math, and reading teacher, completed a teacher questionnaire. (R. 325-32.) It noted that J.D.P. was included in the regular class, but was pulled out for some material. (R. 325.) Ms. Hunter stated that J.D.P. had a very serious problem acquiring and using information, and that he received one-on-one help for much of his work. (R. 326). She also noted that J.D.P. had not had a problem with asthma at school. (R. 331.) She stated that J.D.P. did not have a very serious problem in any other domain. (R. 325-32.)

11

In July, 2006, Seneca Health Services completed a social history for J.D.P. noting that he was in learning disability classes and had asthma. (R. 335.) The report noted that J.D.P.'s mother and teachers reported that he had tantrums and that his ADHD was likely to worsen over time. (R. 335.)

Chameleon Health Care, Inc. completed a psychoeducational evaluation of J.D.P. on September 19, 2006. The report noted that J.D.P. was fidgety during testing and had to be redirected. (R. 345.) J.D.P. was tested on the Wechsler Intelligence Scale for Children, and scored a sixty-seven (67) in verbal comprehension, a seventy-nine (79) in perceptual reasoning, with a full scale of a sixty-two (62). (R. 345.) His processing speed was sixty-two (62), working memory was sixty-eight (68), and general ability index was seventy (70). (R. 345.) The report noted that the IQ score of sixty-two "falls in the Mild Mental Retardation range . . ." (R. 345.) The report further noted that J.D.P. received a reading composite score of fifty-nine (59) and a mathematics score of sixty-six (66), and finally a written language score of sixty-five (65). (R. 346.) All of those scores fall into the mild mental retardation range. (R. 346.) Chameleon Health Care's report stated that J.D.P.'s "difficulties in an academic setting would appear to be directly related to his intellectual functioning." (R. 346.)

In October 2006, the Webster County Schools completed an IEP that opined that J.D.P. was mentally impaired. (R. 340.) Specifically, the report indicated that J.D.P. had intellectual functioning approximately seventy to seventy-five (70-75) or below on a scale of one hundred. (R. 341.) It further stated that J.D.P. had related limitations in two or more adaptive skill areas. (R. 341.)

12

## IV.

The Commissioner moved for summary judgment on the claim, raised in plaintiff's complaint, Dkt. #3, that the ALJ's determination was not supported by substantial evidence. Substantial evidence supports the ALJ's determination that J.D.P.'s impairments do not meet or medically equal the criteria for any listed impairment. As the ALJ found, the record shows that J.D.P. suffers from severe impairments due to his ADHD, asthma, learning problems, speech problems, hearing problems, and stomach problems. However, these problems do not rise to the level of a disability entitling J.D.P. to SSI. The determination as to whether a child is disabled proceeds in three prongs.

First, the ALJ found that J.D.P. had not engaged in gainful employment. There is no dispute as to this prong.

Second, the ALJ found that J.D.P.'s impairments did not meet or medically equal any listed impairment. (R. 16.) Medical experts are properly given weight in determining whether a plaintiff's impairments medically equal listed impairments; additionally during initial consideration medical and psychological experts are to determine whether J.D.P.'s impairment is a medical equivalent. 20 C.F.R. § 416.926(c), (e). The ALJ accorded "great weight to the opinions of the medical experts" who testified at the hearing. (R. 16.) Dr. Stevens testified that J.D.P.'s impairments with regard to hearing problems and stomach problems did not meet or medically equal any listings. (R. 370-72.) Dr. Bennett acknowledged that J.D.P. is impaired, testifying that J.D.P.'s met criteria A for attention deficit hyperactivity disorder (Listing 112.11), but highlighted that J.D.P.'s ADHD is controlled by medication.[3] (R. 379.) Dr. Bennett also

---

[3]An individual must meet both criteria A and B to meet Listing 112.11. Listing 112.11.

13

testified that one may wish to consider whether J.D.P. had an organic mental disorder (Listing 112.02), but that he dismissed such a possibility because the records showed that J.D.P. had a well substantiated phonological disorder. (R. 379-80.) The two experts' testimony was not contradicted by any other expert's testimony. Indeed, their testimony is corroborated by the two prior examinations made by consultants pursuant to 20 C.F.R. § 416.926(d). (R. 228-33; 246-51). In short, no medical expert opined on the record that J.D.P.'s impairments meet or medically equal a listing. Thus, the ALJ's second determination is supported by substantial evidence.

Third, the ALJ determined that J.D.P. does not possess impairments functionally equivalent to any listed impairment. This determination was based upon an analysis of six domains of function:

(a) acquiring and using information;

(b) attending and completing tasks;

(c) interacting and relating with others;

(d) moving about and manipulating objects;

(e) ability to care for oneself; and

(f) health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

In domain (a), acquiring and using information, the Commissioner must "consider how well [a claimant] acquire[s] or learn[s] information," and how well the information learned is used. 20 C.F.R. § 416.926a(g). Most specifically, school-aged children such as J.D.P. should:

> be able to learn to read, write, and do math, and discuss history and science. You
> will need to use these skills in academic situations to demonstrate what you have

14

learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

In determining that J.D.P. does not have marked or extreme impairment with regard to (a), acquiring and using information, the ALJ noted that though J.D.P. has a learning disability, he received less than five hours per week of special education, and such special education was only for reading and language arts. (R. 18.) The ALJ additionally noted that J.D.P. received only one below average grade in the report card prior to the administrative hearing. (R. 18.)

As noted a "marked" limitation occurs when an individual's impairment "seriously interferes" in the particular domain, or when the individual scores roughly two standard deviations below the mean on tests. 20 C.F.R. § 416.926a(e)(2)(i). The ALJ's decision that J.D.P. had less than a marked impairment in this domain is well supported by the record; both childhood disability evaluations filled out by consultants stated that J.D.P. had a less than marked impairment in this domain. (R. 229, 248.) The ALJ's decision is further supported by J.D.P.'s IEPs. J.D.P.'s 2003 education plan in West Virginia identified J.D.P. as having communication needs. (R. 80.) Under that IEP, J.D.P. was to spend the bulk of his time in regular classrooms, and was to take state standardized tests under normal conditions with no modifications. (R. 80.) Roanoke City's 2003 IEP similarly identified J.D.P. as having a speech and language disability. (R. 98.) Given that J.D.P. spent the vast majority of his time in regular classrooms, the IEPs do

15

not support the notion that impairments "seriously interfered" with J.D.P.'s ability to be in a regular classroom. Indeed, J.D.P.'s June, 2003 evaluation did not qualify J.D.P. for special education. (R. 62.) Further, J.D.P.'s standardized test scores from the time period at issue are not two standard deviations below the mean. Rather, J.D.P. scored an eighty-five (85) on an IQ test in 2003 (R. 63), and a ninety-two (92) in January, 2005. (R. 203.) These scores are within average to low average ranges for IQ, well above the two standard deviation marker that denotes a "marked" limitation.

In domain (b), the Commissioner must "consider how well [a claimant is] able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies] through, and finish[es his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). A child the age of J.D.P. should:

> be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

With regard to domain (b), attending and completing tasks, the ALJ determined that J.D.P.'s impairments are less than marked in severity. The ALJ acknowledged that J.D.P. suffers from ADHD, but noted that J.D.P. was able to sit still during the administrative hearing and that his report card indicated that ADHD was not interfering with his school work. (R. 18.)

16

The ALJ's determination is supported by substantial evidence. The November Evaluation found that J.D.P. had no marked limitation in this domain. (R. 230.) Additionally, a review of the medical records included in the administrative record shows that J.D.P.'s ADHD responds to medication. For example, J.D.P. indicated some trouble with ADHD in 2003. However after a switch to Adderall, his mother was "thrilled w[ith his] school performance." (R. 238.) Even in February, 2004, when J.D.P.'s mother reported ADHD trouble to a doctor, a notation highlighted that J.D.P.'s grades were improving. (R. 235.)

The administrative record is not uniform in suggesting that there is no marked limitation in domain (b). The March Evaluation indicated that J.D.P. has a marked impairment in this domain because J.D.P.'s teachers and mom did not think that the medicine prescribed for J.D.P. was effective. (R. 248). However, the March Evaluation's findings do not outweigh the bulk of the other evidence. Particularly, the November Evaluation would have had a greater number of data points for review. Additionally, at the administrative hearing in 2006, J.D.P.'s mother testified that J.D.P.'s ADHD was much improved when he was taking his medicine. (R. 375.) Based on this, Dr. Bennett testified that J.D.P.'s limitations were less than marked. (R. 380.) The ALJ's finding that J.D.P.'s impairment in domain (b) is less than marked is supported by substantial evidence, given the additional opinions of experts, J.D.P.'s school performance, and the testimony of his mother.

In considering domain (c), interacting with others, the Commissioner must "consider how well [a claimant] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his] community, cooperate[s] with others, compl[ies] with rules,

17

respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). A school aged child, up to the age of 12:

> should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv). The ALJ also found that J.D.P. has less than marked impairment in (c) interacting and relating to others, having assigned great weight to the opinion of the testifying medical expert. (R. 19.) The ALJ noted that J.D.P. may have some difficulty hearing others, but found that there was no other evidence to suggest trouble in socializing. (R. 19.)

The ALJ's determination is supported by substantial evidence in the record. Both the March Evaluation and Dr. Bennett indicated that J.D.P. had a less than marked impairment in relating to others. (R. 280.) Though J.D.P. suffers from a speech problem, and at times had trouble "verbally expressing himself" (R. 206), J.D.P. passed a screening for hearing problems. (R. 205.) Additionally, he showed progress in his speech and phonology goals when he received treatment. (R. 156-67.) Indeed, one of J.D.P.'s teachers noted that when he was struggling, J.D.P. relied on others for direction. (R. 203.)

The November Evaluation suggested that J.D.P. has a marked impairment because of difficulties in articulation. (R. 230.) However, the notes accompanying the November Evaluation characterized J.D.P. as having a "moderate to severe articulation disorder" and a "moderate articulation delay." (R. 230.) Moderate problems do no amount to marked limitations. Additionally, the record suggests that some of J.D.P.'s difficulties could be

18

attributed to frequent moves and disruptions in his speech therapy. (R. 204; 208.) The information on the record is adequate to support a conclusion by a reasonable mind or to refuse a directed verdict. Perales, 402 U.S. at 401 (1971); Smith v. Chater, 99 F.3d at 638. Thus, the ALJ's determination as to domain (c) is supported by more than a scintilla of evidence, and thus, by substantial evidence.

With regard to domain (d), moving around and manipulating objects, the Commissioner must "consider how [a claimant] move[s his] body from one place to another and how [he] move[s] and manipulate[s] things." 20 C.F.R. § 416.926a(j). A child the age of J.D.P. should be:

> developing gross motor skills should let you move at an efficient pace about your school, home, and neighborhood. Your increasing strength and coordination should expand your ability to enjoy a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls in informal play or organized sports. Your developing fine motor skills should enable you to do things like use many kitchen and household tools independently, use scissors, and write.

20 C.F.R. § 416.926a(j)(2)(iv).

In determining that J.D.P. did not have a limitation in (d) moving around and manipulating objects, the ALJ stated there was no objective evidence to support Siler's testimony that J.D.P.'s asthma has required emergency intervention. (R. 19.) Neither of the two childhood disability evaluations, nor Dr. Bennett's testimony, indicated that this was an impairment in this domain. (R. 232, 251, 281.) A review of the doctors' records submitted into the administrative record demonstrates that the ALJ's decision is supported by substantial evidence. Asthma is infrequently mentioned in the medical records, and there are no references to acute asthma conditions or limitations placed on J.D.P. because of asthma.

19

With regard to domain (e), the ability to care for one's self, the Commissioner must "consider how well [a claimant] maintain[s] a healthy emotional and physical state, including how well [he] get[s] [his] physical and emotional wants and needs met in appropriate ways; how [he] cope[s] with stress and changes in [his] environment; and whether [he] take[s] care of [his] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). For a child of J.D.P.'s age:

> [y]ou should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).

The ALJ also found that there was no objective evidence to indicate J.D.P. suffered from difficulty in domain (e), the ability to care for oneself. (R. 19.) The ALJ's decision is supported by substantial evidence; the March and November Evaluations both stated that he had no limitation in this domain. (R. 232, 251.) Dr. Stevens testified that J.D.P. had a less than marked limitation. (R. 381.)

The record reflects that J.D.P. was once suspended from school for one day for threatening to kill another person. (R. 153.) However, the record does not reflect any pattern of unacceptable behavior. An isolated incident is insufficient to overcome the strong presumption in favor of finding substantial evidence. Thus, the ALJ's determination as to domain (e) is supported by substantial evidence.

20

With regard to domain (f), the Commissioner must "consider the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning that we did not consider in [domain (e)]." 20 C.F.R. § 416.926a(l). Examples of limitations in this domain include, but are not limited to, generalized symptoms, somatic complaints, limitations in physical functioning caused by treatment, or the need to have excessive medical care to maintain a level of health and well-being. 20 C.F.R. § 416.926a(l)(4)(i)-(v). A finding of marked limitation in the sixth domain may be made if a claimant is frequently ill because of his or her impairments. 20 C.F.R. § 416.926a(e)(2)(iv). "Frequent" is defined as "episodes of illness or exacerbation that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more." Id.

The ALJ also found no evidence to suggest that there were any negative, cumulative effects on J.D.P.'s physical health, domain (f). (R. 19.)[4] The ALJ's opinion is supported by testimony from the administrative hearing and the November Evaluation. With regard to J.D.P.'s asthma, Dr. Stevens also testified that J.D.P.'s asthma was not severe in nature, as it has not required sophisticated evaluation or treatment. (R. 371.) This is echoed by the November Evaluation, which found that there was no limitation in this domain, noting that J.D.P. was not subject to any limitations for asthma, had no hospital visits for asthma, and that he was on medicine as needed.[5] (R. 232.)

_____

[4]The ALJ had already found Carrie Siler's testimony as to J.D.P.'s breathing problems to lack credibility, as there was no objective evidence suggesting that J.D.P. required emergency intervention for asthma. (R. 19.)

[5]The March Evaluation did not take a position on whether J.D.P. suffered a marked limitation in this domain. (R. 251.)

21

As to J.D.P.'s hearing problem, Dr. Stevens testified that J.D.P. suffered from otitis media with a draining ear, but that J.D.P.'s decreased hearing was not a severe deficit and that J.D.P. was able to hear in his classrooms when he sat up front. (R. 370.) As to J.D.P.'s stomach problems, Dr. Stevens testified that J.D.P. had toddler's diarrhea and that with appropriate medication running seemed to have been eliminated. (R. 371.) Dr. Steven's testified that J.D.P.'s weight at the time of the administrative hearing showed that J.D.P. did not suffer problems with nutritional development or in absorbing nourishment. (R. 372.)

The ALJ's opinion is supported by substantial evidence. The medical records indicate that J.D.P. suffers from "toddler's diarrhea" due to excessive sugary drinks. (R. 262.) Subsequent tests to find other root causes of J.D.P.'s diarrhea found no serious abnormalities. (R. 297-301.) Medical records from throughout the time span at issue describe J.D.P. as "normally developing" (R. 87), and "well developed [and] well nourished" (R. 291). As such, the ALJ's determination as to the final domain is supported by substantial evidence and the government's motion for summary judgment is granted as to the claim that the ALJ's decision was supported by substantial evidence.

## V.

Plaintiff moves for remand under both "sentence four"[6] and "sentence six"[7] of 42 U.S.C. § 405(g). Plaintiff argues that the interim evidence submitted to the Appeals Council demonstrates "that the plaintiff's ADHD and his problems with learning, speech, and hearing impose additional and significant limitations of function and he arguably meets Listing 112.05(D)." (Plaintiff's Brief, Dkt. # 18, at 6.) Listing 112.05(D) is for mental retardation, "a valid verbal, performance, or full scale IS of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function . . . ." Listing 112.05(D).

---

[6] Sentence four of 42 U.S.C. § 405(g) provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

[7] Sentence six of 42 U.S.C. § 405(g) provides that:

[t]he court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

23

The appropriate standard for review of remand request is sentence four of 42 U.S.C. § 405(g), rather than sentence six. For sentence four of 42 U.S.C. § 405(g) to apply, the judgment of the court must be based "upon the pleadings and transcript of the record." Sentence six, on the other hand, applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council.

In this case, the evidence is not "new," and as such is not eligible for a sentence six remand. The record clearly shows that the Appeals Council reviewed the interim evidence. (R. 8.)[8] Further, the Appeals Court included the interim evidence in the administrative record. Thus, this case falls within the plain language of sentence four, as the court's review is based upon "the transcript of the record."[9]

---

[8]Counsel for Plaintiff argues that this matter should be remanded because the Appeals Council did not specifically discuss the interim evidence and state what weight the evidence had been given. (Plaintiff's Brief, Dkt. #18, at 6.) However, the weight of the authority in the Western District of Virginia is that the Appeals Council need not explicitly discuss interim evidence. See Browning v. Sullivan, 2005 WL 1804423 *3-5. No. 6:04cv-000017 (W.D. Va. 1992).

[9]Defendant argues on the basis of Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001) that the interim evidence must be considered under "sentence six" rather than "sentence four". There is a circuit split on the treatment of such evidence. Adkins v. Barnhart, No. 2:02-0087, 2003 WL 21105103, at *6 n. 5 (S.W. W.Va. 2003). The Fourth Circuit has not adopted the Third Circuit position, but rather examines new evidence included by the Appeals Council on the record to see if the ALJ's position is supported by substantial evidence. Id.; see Wilkins v. Sec'y, Dep't Health & Human Servs., 953 F.2d 93, 96 (4th Cir.1991)

24

## VI.

The court must determine whether the interim evidence requires remand. In <u>Wilkins</u>, the Fourth Circuit held that a reviewing court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings."[10] 953 F.2d at 96. In this regard, the court is not deciding whether the Appeals Council erred in not reviewing the decision of the ALJ; rather, the court is reviewing, under <u>Wilkins</u>, whether there is "a reasonable possibility" that the interim evidence submitted to the Appeals Council and considered by it would have changed the outcome. 953 F.2d at 956. <u>See</u> <u>Borders v. Heckler</u>, 777 F.2d 954, 956 (4th Cir. 1985).

The interim evidence does not establish that the ALJ's decision might reasonably have been different. With the interim evidence, the plaintiff essentially argues that four years of reasoned and well supported evaluations suggesting that J.D.P. has a learning disability are in error, and that in fact J.D.P. is mentally retarded. Such a proposition is not in concert with the record, and there is not a reasonable possibility that the ALJ would have made a different determination had he been presented with this evidence. Each piece of evidence in considered in turn.

First, the plaintiff places the most emphasis on the new IQ test, which suggests that J.D.P. has a much lower IQ, sixty-two (62), than was suggested by two prior tests. J.D.P.'s prior overall scores were eighty-five (85) and ninety (90). (R. 63, 203). Rather than suggesting that J.D.P. has

---

[10]The use of the term "new evidence" is confusing. The interim evidence is new, in that it was not presented to the ALJ. It is not new, in the sense that it was included in the administrative record.

a discrete learning disability, the report from Chameleon Health Care, Inc., stated that J.D.P.'s challenges "appear to be directly related to his intellectual functioning." (R. 346.) The ALJ would likely have dismissed this lower score, and the associated suggestion that J.D.P. has an organic mental disorder, given that weight of evidence suggesting otherwise. The score of sixty-two (62) is an outlier in comparison with two prior IQ tests that gave J.D.P. relatively similar scores. As is recounted in Section IV, supra, J.D.P. has been diagnosed multiple times by different experts in different states as having a learning disability. There is nothing in the record to explain why the prior diagnoses were in error. Given that J.D.P. was able to progress when given consistent educational opportunities dealing with his discrete speech and language disability, the suggestion that he has an organic mental disorder lacks credibility. Moreover, even if the ALJ had accepted the new, lower IQ score, J.D.P. would not have met the criteria for Listing 112.05, because the record does not demonstrate an additional "physical or other mental impairment imposing an additional and significant limitation of function . . . ." Listing 112.05(D).

Second, the questionnaire completed by one of J.D.P.'s teachers, Tammy Hunter, similarly does not provide evidence sufficient to upset the ALJ's finding. (R. 325-32.) Most notably, Ms. Hunter opines that J.D.P. has serious problems in acquiring and using information, domain (a), specifically marking on a form that J.D.P. has "very serious problems" with "[p]roviding organized oral explanations and adequate descriptions," "[e]xpressing ideas in written form", and "[a]pplying problem-solving skills in class discussions". (R. 326.) She additionally notes that J.D.P. has "a serious problem" with a variety of tasks including "[r]eading and comprehending material" and "an obvious problem" with tasks like "[c]omprehending oral

instructions" and "[le]earning new material". (R. 326.) Ms. Hunter further states that J.D.P. does not have a serious problem in any other domain and notes that he has never had an asthma attack at school. (R. 331.) This information supports the ALJ's finding that J.D.P. does not have a marked disability in domains (b) through (f).

Ms. Hunter's observation that J.D.P. has a very serious problem in domain (a) adds weight to the seriousness of J.D.P.'s impairments. However, it does not establish that he has a marked impairment in the area. Rather, Ms. Hunter's observations supports information that was already available to the ALJ, namely that J.D.P. has a learning disability for which he receives special education. Additionally, Ms. Hunter's opinion is not given the same weight under the Code of Federal Regulations as that of the two consultants, who stated in the March and November Evaluations that J.D.P. does not have a marked disability in learning. (R. 230, 248.)

Even taking the teacher's questionnaire and the IQ test in conjunction, the two materials do not undercut the prior findings that J.D.P. suffers from specific impairments related to phonology and speech, rather than a general mental disorder as is now urged. In short, this is not a case where the ALJ made a close decision on the basis of the records at the administrative hearing. Rather, the decision of the ALJ was supported by the vast weight of the evidence; as such the addition of a few additional materials does not upend the balance of decision reached by the ALJ, particularly when considered in light of the substantial evidence standard.

Third, plaintiff submitted a report from Seneca Health Services, which stated that J.D.P.'s ADHD might get worse with time. (R. 335.) The report further recounts plaintiff's report that teachers and others see problems with J.D.P.'s ADHD. (R. 335.) The statement that J.D.P.'s ADHD might worsen with time actually cuts against plaintiff's claim, as it suggests that

information submitted subsequent to the administrative hearing may not be reflective of J.D.P.'s actual state during the time period at issue in the administrative proceeding. In short, the Seneca Health Services report does not relate back to the time period in which the application was filed, and calls into doubt the other evidence submitted by plaintiff subsequent to the administrative hearing.

Fourth, the school records submitted showing that J.D.P. has now been classified by Webster County Schools as having a mental handicap would not reasonably have changed the ALJ's determination, given that multiple IEP committees operating during the time period at issue chose not to make that determination. One IEP created shortly after an outlier IQ test was given, does not call into question the substantial evidence that led the ALJ to deny benefits previously.

Finally, the records submitted from Dr. Scott Luthman are barely legible. They appear to adjust J.D.P.'s ADHD medicine, but provide little insight into J.D.P.'s state and little new information. As such, they do not provide information that might have changed the ALJ's decision. (R. 320-324.)

## VII.

Accordingly, the court affirms the final decision of the Commissioner and grants the defendant's motion for summary judgment. In affirming the final judgment of the Commissioner, the court does not suggest that J.D.P. is totally free of any impairment. Rather, the court finds that the objective medical record and evidence from J.D.P.'s doctors, teachers, and counselors simply fails to document the existence of any condition which would reasonably be expected to

28

result in total disability for all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating the claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Additionally, the court finds that the ALJ's decision would likely remain unchanged in the face of the interim evidence. Defendant's motion for summary judgment must be granted.

The Clerk of the Court is hereby directed to send a certified copy of the Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 18th day of June, 2009.

/s/     Michael F. Urbanski
        United States Magistrate Judge